UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 0:24-cv-60489-LEIBOWITZ

**RICKEY MARTIN,** *on behalf of himself and others similarly situated,*

    *Plaintiff,*

v.

**LENS.COM, INC.,**

    *Defendant.*

_____/

## MEMORANDUM OPINION AND OMNIBUS ORDER

When you buy something online, and you click the buttons to set up and consummate the transaction, what exactly are you agreeing to? Every term and condition contained within any hyperlink on the screen? Does it matter what color the buttons are, how large the font is, or when you click certain buttons? What if the hyperlinks with all the terms are above the buttons? What if they are below them? Does it matter what the actual terms are, or if you click on the links and look at the terms or not? With more than $1 trillion in online transactions executed by Americans in 2023,[1] our law sets out clear, bright-line answers to most of this by now, right? Spoiler alert: Not so much.

These questions arise from three pending motions before the Court: (1) Defendant's Motion to Change Venue [ECF No. 17]; (2) Defendant's Motion to Dismiss [ECF No. 18]; and (3) Plaintiff's Motion to Strike [ECF No. 46] (collectively "the Motions"). On October 25, 2024, the Court held a hearing on the enforceability of a forum-selection clause embedded within a hyperlink, upon which

---

[1] John Koetsier, *E-Commerce Retail Just Passed $1 Trillion For The First Time Ever,* Forbes Magazine (Feb. 2, 2023, 11:43 AM Eastern), http://www.forbes.com/sites/johnkoetsier/2023/01/28/e-commerce-retail-just-passed-1-trillion-for-the-first-time-ever (last visited Nov, 18, 2024).

Defendant moves to dismiss and transfer this Florida-filed case to Nevada. [*SEE PAPERLESS MINUTE ENTRY*, ECF No. 48]. After due consideration of the Motions, the parties' papers and arguments, the record, and the relevant law, the Court GRANTS IN PART and DENIES IN PART Defendant's Motions to Change Venue and Dismiss [ECF Nos. 17, 18]. Plaintiff's common law claims for breach of contract (Count II) and unjust enrichment (Count III) are TRANSFERRED to the United States District Court for the District of Nevada, pursuant to 28 U.S.C. § 1404(a). However, this Court retains jurisdiction over Plaintiff's claim brought pursuant to the Florida Deceptive and Unfair Trade Practices Act ("FDUPTA"), Fla. Stat. § 501.201, *et seq.* (Count I). Finally, and in light of the other rulings, the Court DENIES Plaintiff's Motion to Strike [ECF No. 46] as MOOT.

## I. FACTUAL BACKGROUND

Plaintiff Rickey Martin (not the "Livin' la Vida Loca" singer-songwriter) is a Florida resident who purchased corrective contact lenses from Defendant Lens.com's website on five separate occasions between January and October, 2021. [Complaint, ECF No. 1-1 ¶¶ 20–24]. When making these online purchases, Martin alleges that Lens.com charged him an undisclosed, unreasonable, and unlawful processing fee in violation of the FDUPTA. [*Id.* ¶ 25]. Martin further alleges that Lens.com advertised one price for its contact lenses but charged 50% more than the advertised price at checkout (*see* "Subtotal" in the graphic below). [*Id.* ¶ 14]. According to Martin, purchasers can only recoup the additional 50% charge by completing a mail-in rebate which is disclosed at checkout for the first time. [*Id.*]. The following is a screen snapshot that helps illustrate Martin's claim.



Martin also alleges that Lens.com charged Florida customers "Taxes and Fees," even though the State of Florida exempts contact lens purchases from sales tax. [*Id.* ¶ 2]. Martin claims that the "Taxes and Fees" are unlawfully deceptive because the charge is "entirely a 'Processing' fee, which Defendant only disclose[s] when a customer requests and receives a 'Full Receipt' from the Defendant's customer service, … <u>after</u> the sale and payment have been finalized." [*Id.* ¶ 15]. From all this, Martin seeks to represent a class of "[a]ll Florida residents and consumers who, within the applicable statute of limitations preceding the filing of this action to the date of class certification, purchased products from Defendant and paid a charge labeled "Taxes & Fees" (known to Defendant as a "Processing" fee)." [ECF No. 1-1 ¶ 26]. Martin wants the trial of this matter to occur here in South Florida.

Not so fast, says Lens.com: By clicking certain buttons in these transactions, Martin agreed

3

that any dispute like this would be handled in Nevada and governed by Nevada law—not in Florida. Lens.com moves to transfer this case to Nevada pursuant to that forum-selection clause it says Plaintiff agreed to when he purchased the contact lenses online. A hyperlink to Defendant's Terms of Use containing the forum-selection clause appears twice during Defendant's online purchase process. First, the Terms of Use hyperlink appears on the Shipping Information page, as follows:



[ECF No. 17 at 8].

The "Continue" button on the Shipping Information page is a large red rectangle with large white text at the bottom center of the page. [*Id.*]. Below the "Continue" button is a notice of acquiescence in smaller black text that reads: "By continuing you agree to our <u>Terms of Use</u> & <u>Privacy Policy</u>."  (This part of the page is reproduced below.)

The underlined text in the notice of acquiescence below the "Continue" button is hyperlinked such that the text color changes from black to red when your cursor hovers over it.  *See* Declaration of Tim Jaeck ("Jaeck Decl.") [ECF No. 17-1 ¶ 11].   Clicking on the Terms of Use hyperlink launches the Terms of Use page.  [*Id.* ¶ 12].  The Terms of Use state, in relevant part:

> These Terms and Conditions of Use shall be governed by and construed in accordance with the laws of the State of Nevada, without regard to choice of law rules. Any litigation arising out of or in connection with the use of this site shall be exclusively venued in state or federal courts located in Clark County, Nevada….

[ECF No. 17 at 6–7].  A customer can scroll past the "Continue" button without clicking it.[2]  If the customer scrolls down to the bottom of the Shipping Information page, the Order Summary displays.  This is the second location where the Terms of Use hyperlink appears.  The Terms of Use hyperlink this time appears below the "Go To Checkout" button.  Jaeck Decl. [ECF No. 17-1 at 17].  Here's the illustration of that:



---

[2]   If the customer clicks on the "Continue" button, a purchase order form displays where the customer can enter their payment information.  [*See* Compl., ECF No. 1-1 ¶ 16].

The "Go to Checkout" button (like the "Continue" button) is a large red rectangle with large white text. *Id.* The Terms of Use hyperlink appears below the "Go To Checkout" button in smaller, underlined black text. Directly below the "Go To Checkout" button is the same notice of acquiescence described above: "By continuing you agree to our Terms of Use & Privacy Policy." (Reproduced and magnified immediately below.)

**Go To Checkout**

By continuing you agree to our Terms of Use & Privacy Policy

Once again, the customer is not required to click the Terms of Use hyperlink or otherwise specifically agree to the terms. The customer can simply click "Go To Checkout" to continue the transaction process.

## II.   PROCEDURAL BACKGROUND

On February 21, 2024, Martin filed his Class Action Complaint in the Circuit Court for the Seventeenth Judicial Circuit in and for Broward County, Florida, asserting a FDUPTA claim (Count I) [ECF No. 1-1 ¶¶ 34–42]; a breach of contract claim (Count II) [*id.* ¶¶ 43–49]; and a claim for unjust enrichment (Count III) [*id.* ¶¶ 50–55]. For relief, Martin seeks a declaration that Lens.com's practices constitute deceptive or unfair trade practices under the FDUPTA, as well as actual damages, restitution, injunctive relief, interest, attorney's fees and costs. [*See id.* at 14].

Lens.com removed the case on March 27, 2024, invoking this Court's original jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d). [ECF No. 1 ¶¶ 20–29]. "CAFA permits the removal of class actions to federal court where the putative class action includes 100 or more members, at least one plaintiff is diverse from one defendant, and the aggregate amount in controversy exceeds $5 million." *Anderson v. Wilco Life Ins. Co.,* 943 F.3d 917, 924–25 (11th Cir. 2019)

(citing 28 U.S.C. §§ 1332(d), 1453).  Lens.com's Notice of Removal clearly meets the statutory requirements for removal under the CAFA.  First, the putative class exceeds 100 members in that Lens.com sold its products to 15,000 consumers in Florida in 2023 alone.  [ECF No. 1 ¶ 29].  Second, the putative class of Florida consumers are diverse in citizenship from Lens.com, a Nevada corporation.  [*Id.* ¶¶ 21–22].  And third, the aggregate amount in controversy exceeds five million dollars based on Defendant's estimate that Florida consumers paid more than $5,000,000 in "Taxes and Fees" between 2020 and 2024.  [*Id.* ¶ 24].

Shortly after removal, Lens.com moved to dismiss and transfer this action to Nevada pursuant to the forum-selection clause discussed above.  The Motions are now fully briefed, supplemented, and ripe for review.  [*See* ECF Nos. 17, 18, 22, 23, 25, 26, 30, 31, 34, 35, 44, 45, 47].  This Court conducted two hearings on the Motion to transfer.  The first was held on August 28, 2024.  [*See* ECF No. 32].  The second was held on October 25, 2024 [*see* ECF No. 48], after the parties engaged in limited discovery on the enforceability of the forum-selection clause.  [ECF No. 37].

### III. DISCUSSION

Lens.com's forum-selection clause is found in what some cases call a "hybrid-wrap" agreement.  Some courts have recognized and discussed three variations of online electronic agreement formats: clickwrap, browsewrap, and hybrid-wrap.  *See, e.g., Domer v. Menard, Inc.,* 116 F.4th 686, 694–95 (7th Cir. 2024).  Clickwrap agreements require the user's affirmative assent to the terms of the agreement, and they are typically enforced.  *Id.* (citation omitted).  Browsewrap agreements "provide veiled notice to customers that mere use of the website constitutes agreement to various terms and conditions."  *Id.* (citation omitted).  These agreements are typically not enforced.  *Id.* at 695.  Hybrid-wrap agreements fall somewhere between the two.

Hybrid-wrap agreements "merely present the user with a hyperlink to their terms and conditions," *Nicosia v. Amazon.com, Inc.*, 384 F. Supp. 3d 254, 266 (E.D.N.Y. 2019), *aff'd* 815 F. App'x

612 (2d Cir. 2020), and display some form of "notice of deemed acquiescence," *Domer*, 116 F.4th at 695. Under this type of agreement format, "an offeree does not have actual notice of certain contract terms, [but] he is nevertheless bound by such terms if he is on inquiry notice of them and assents to them through conduct that a reasonable person would understand to constitute assent." *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 289 (2d Cir. 2019). A user is put on "inquiry notice" if the "design and content" of the webpage renders "existence" of those terms "reasonably conspicuous." *Nicosia*, 834 F.3d at 233. Because assent to a hybrid-wrap agreement is "passive," these agreements are enforced "only if: (1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Domer*, 116 F. 4th at 695 (citations omitted).

In the case at hand, the text below the action buttons informs consumers that they "agree to" Defendant's Terms of Use by clicking the "Continue" or "Go To Checkout" buttons-- a notice of deemed acquiescence. Within the "notice of deemed acquiescence" is a hyperlink to the Terms of Use where the forum-selection clause lies. To determine whether the forum-selection clause is enforceable, the Court must first determine whether Defendant's Terms of Use hyperlink is sufficiently conspicuous to put a prudent internet user on inquiry notice. If so, the Court must then decide whether a user's clicking the "Continue" or "Go To Checkout" button unambiguously manifests the user's consent to the agreement terms.

### A. <u>Enforceability of the Forum-Selection Clause</u>.[3]

---

[3] Plaintiff contact lens purchasers have filed five class action lawsuits in various Districts across the nation for conduct similar to that alleged in the Complaint. *See Franks v. Lens.com, Inc.,* No. 2:24-cv-00724 (D. Nev.); *Fitzpatrick v. Lens.com, Inc.,* No. 1:24-cv-02700 (N.D. Ill.); *Nail v. Lens.com, Inc.* No. 2:24-cv-02531 (C.D. Cal.); and *Gonneville v. Lens.com, Inc.,* No. 1:24-cv-11110 (D. Mass). Two District Courts— one in Central California and the other in Northern Illinois— recently enforced the subject forum-selection clause and transferred their cases to Nevada. *See Fitzpatrick v. Lens.com, Inc.,* No. 1:24-cv-02700 (N.D. Ill. Oct. 23, 2024); *Nail v. Lens.com, Inc.* No. 2:24-cv-02531 (C.D. Cal. June 20, 2024).

1. <u>The Terms of Use hyperlink is sufficiently conspicuous</u>.

Plaintiff contends that the Terms of Use hyperlink is not conspicuous because (1) the font size is significantly smaller than the text of the action buttons; (2) the text color is black (not the traditional blue used for hyperlinks); (3) the hyperlink is placed below (rather than above) the action buttons; and (4) the hyperlink appears only on the Shipping Information page (albeit twice). [ECF No. 23 at 13–18]. Defendant counters that the Terms of Use hyperlink is sufficiently conspicuous because (1) the black text is set against a white background; (2) the hyperlink text is underlined; (3) the hyperlink text turns red when a mouse hovers over it; (4) the font size is readable; and (5) the language is simple— "By continuing you agree to our <u>Terms of Use</u> & <u>Privacy Policy</u>." [ECF No. 26 at 7].

In Florida, absent actual knowledge, a "reasonably prudent internet user" must be put on "inquiry notice" before an internet agreement will be enforced. *See Fridman v. 1-800 Contacts, Inc.*, 554 F. Supp. 3d 1252, 1260 (S.D. Fla. 2021); *IT Strategies Group, Inc. v. Allday Consulting Group, L.L.C.*, 975 F. Supp. 2d 1267, 1280 (S.D. Fla. 2013). In deciding whether a user was put on inquiry notice, "courts evaluate the conspicuousness and placement of the hyperlink as well as whether the site provided notice that a specific action would demonstrate acceptance of those terms." *See Goldstein v. Fandago Media, LLC,* No. 9:21-cv-80466-RAR, 2021 WL 6617447, at *2 (S.D. Fla. July 27, 2021) (citing *Bell v. Royal Seas Cruises, Inc.,* No. 19-CV-60752, 2020 WL 5742189, at *6 (citing *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1177 (9th Cir. 2014) (holding that the "conspicuousness and placement" of the

---

These judges found the forum-selection clause enforceable, relying on case law holding that hybrid-wrap agreements are enforceable only if "(1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *See Domer,* 116 F.4th at 694–95 (citation omitted). Applying that two-part test, the *Nail* and *Fitzpatrick* courts determined that Defendant's Terms of Use hyperlink was conspicuous, and that Plaintiff's clicking the "Continue" button manifested assent to the forum-selection clause. After careful review of both opinions, this Court agrees with their reasoning and rulings.

hyperlink and "the website's general design all contribute to whether a reasonably prudent user would have inquiry notice of a browsewrap agreement")).

Although not binding, courts consider the following factors when making conspicuousness determinations: "color, size, positioning, language, and design of the hyperlink and its accompanying text." *Tejon v. Zeus Networks, LLC*, No. 24-cv-20498-PCH, 2024 WL 1293757, at *2 (S.D. Fla. Mar. 26, 2024) (citations omitted). Applying all these factors, this is where the bright lines start to dim and judicial balancing starts to look more like Justice Stewart's famous definition of obscenity:[4] The combination of font color, font size, relative positioning, specific language, and overall design of Lens.com's Terms of Use hyperlink puts a prudent internet user on "inquiry notice."

Here, although the font color and font size of the hyperlink and notice of acquiescence do not "shout out" for attention, the font color and font size used do not bury or obscure the text (because I know it when I see it!). While the large red action buttons certainly attract the user's attention, the hyperlinks and text immediately below the buttons are visible and readable.[5] Moreover, the notice "By continuing you agree to our Terms of Use & Privacy Policy" is in black font set against a white background with sufficient space above and beneath the text to make the notice stand out. The additional feature that the underlined hyperlink's text color changes from black to red when the cursor hovers over it tends toward conspicuousness and away from obscurity.

---

[4]	*See Jacobellis v. Ohio*, 378 U.S. 184, 197 (1964) (Stewart, J., concurring) ("I shall not today attempt further to define the kinds of material I understand to be embraced within that shorthand description ["hard-core pornography"], and perhaps I could never succeed in intelligibly doing so. But *I know it when I see it*, and the motion picture involved in this case is not that.") (emphasis added).

[5]	Although formal judicial notice is not always taken in these kinds of cases and disputes, in virtually any current online transaction the actual font size of the characters, as well as their relative position to each other, is within the significant control of the consumer. Therefore, the very act of processing and completing the entire online transaction, in the absence of obvious and unusual placement of certain terms on the website, carries with it the reasonable inference that either the consumer was aware of the possibility of additional terms and conditions or the affirmative decision to transact without inquiring about them.

Contrary to Martin's contention, the cases he relies on do not create a bright-line rule such that a hyperlink to contract terms is deemed inconspicuous solely because it is positioned below an action button. Indeed, each of the cases Martin cites for this proposition is distinguishable.[6] In *Goldstein,* 2021 WL 6617447, and *Tejon,* 2024 WL 1293757, the court considered the enforceability of an arbitration agreement accessible by hyperlink. In those cases, the court determined that inconspicuous placement of the hyperlink coupled with the language used was insufficient to put a reasonable user on notice of the waiver of the right to sue. *Goldstein,* 2021 WL 6617447, at *3–4; *Tejon,* 2024 WL 1293757, at *3–4.

In this case, Defendant seeks to enforce a forum-selection clause that dictates where (not if) Plaintiff may hale Defendant into court. This case is also different from *Goldstein* and *Tejon* because the acquiescence notices there were obscured by their lack of simple phrasing and their lack of stark contrast between the text and background. *See Goldstein,* 2021 WL 6617447, at *1 *Tejon,* 2024 WL 1293757, at *1. Accordingly, the placement of the notices below the action button in *Goldstein* and *Tejon* accentuated the hidden nature of those notices. Here, relatively speaking, the notice "pops" off of the screen.

Having examined all factors (color, size, positioning, language, and overall design of the hyperlink and its accompanying text) in their totality, the Court finds Lens.com's Terms of Use hyperlink sufficiently conspicuous to put a prudent internet user on inquiry notice. Having so found, the Court considers whether Plaintiff unambiguously manifested his consent.

2. <u>Clicking the action button unambiguously manifested Plaintiff's assent</u>.

Martin argues that he should not be bound by the forum-selection clause because he never

---

[6]   *Zamber v. Am. Airlines, Inc.,* No. 15-23901-CV-MARTINEZ/GOODMAN, 2020 WL 1445479, at *3 (S.D. Fla. Feb. 11, 2020) is inapposite because there the court enforced a forum-selection clause which was found in a clickwrap agreement.

11

saw the Terms of Use hyperlink. [ECF No. 23 at 12]. In essence, Martin contends that there was no "meeting of the minds." [*Id.*] Lens.com counters that Martin agreed to the forum-selection clause by clicking an action button where notice was provided immediately below the button. By continuing, Martin agreed to the Terms of Use which were readily accessible by hyperlink. [ECF No. 26 at 4]. Here, Lens.com has the better of it.

Black-letter law doesn't get more black than this: A binding and enforceable contract requires "mutual assent to certain and definite contractual terms; without a meeting of the minds on all of the essential terms, no enforceable contract arises." *In the Matter of T & B General Contracting, Inc.,* 833 F.2d 1455, 1459 (11th Cir. 1987). "While new commerce on the Internet has exposed courts to many new situations it has not fundamentally changed the principles of contract." *LoanFlight Lending, LLC v. Bankrate, LLC*, 378 So.3d 1280, 1286 (Fla. 2d DCA 2024) (citation omitted).

> Mutual assent remains the touchstone of contract formation. … And mutual assent cannot exist where a party does not have reasonable notice that an offer is at hand. In other words, reasonable notice of an offer is a necessary precondition to mutual assent. And requiring mutual assent ensures consumers know they are entering into an agreement.

*Eglin Fed. Credit Union v. Baird,* No. 1D2023-1866, 2024 WL 3956764, at *2 (Fla. 1st DCA Aug. 28, 2024) (internal citation omitted); *See Glosser v. Vasquez*, 898 So.2d 1179, 1181 (Fla. 3d DCA 2005) ("Thus, to create a contract and trigger contractual obligations, the parties must have a definite and distinct understanding, without which there is no assent and no contract.") (citation omitted).

Florida courts recognize that "notice can come in many forms." *Eglin Fed. Credit Union,* 2024 WL 3956764, at *3 (citing *Hallman v. Carnival Cruise Lines, Inc.*, 459 So. 2d 378, 380–81 (Fla. 3d DCA 1984) (holding a passenger ticket warning passenger of the conditions of the contract was reasonable because of "the conspicuousness and clarity of notice on the face of the ticket"); *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1033–34 (7th Cir. 2016) (explaining that a clickwrap agreement can signify acceptance of contract if "the layout and language of the site gives the user reasonable notice that a

click will manifest assent to an agreement")).  Whether a party received reasonable notice is a fact-intensive inquiry, and for internet transactions "the design and content of the relevant interface" are especially relevant.  *Id.* (citation omitted).

In the case at hand, Plaintiff unambiguously manifested his consent to the Terms of Use by clicking "Continue" where clear notice was provided immediately below the "Continue" button that "By continuing you agree to our Terms of Use & Privacy Policy."  At that moment, Plaintiff had the opportunity to click on the Terms of Use hyperlink, read the terms— including the forum selection clause— and decline to continue to process the transaction.  Even though Plaintiff testified at his deposition that he never saw the hyperlink, actual knowledge is not the test.  Indeed, "actual knowledge" has for all practical purposes been replaced with "inquiry notice" as far as manifesting assent to online agreements.  *See Bell v. Royal Seas Cruises, Inc.,* No. 19-CV-60752, 2020 WL 5742189, at *7 (S.D. Fla. May 13, 2020), report and recommendation adopted, No. 19-CIV-60752-RAR, 2020 WL 5639947 (S.D. Fla. Sept. 21, 2020) (analyzing the enforceability of an online agreement as to website design and constructive notice in the absence of actual notice); *see also, Domer,* 116 4th at 695 (enforcing hybrid-wrap agreement where assent was not express but "unambiguous in the light of the objectively reasonable notice"); *Soliman v. Subway Franchisee Advert. Fund Tr., Ltd.,* 999 F.3d 828, 834 (2d Cir. 2021) ("We have held that, even where the offeree does not have *actual* notice of the contract terms [and conditions on Defendant's website], she will still be bound by such terms if a "reasonably prudent" person would be on *inquiry* notice of those terms and she unambiguously manifested assent to those terms.") (citation omitted).

If Tallahassee or Congress declared some default rules for what constitutes inquiry notice in the realm of online contractual transactions, that would create some brighter lines; but they have not done so.  Unless and until they do, this court will not retroactively declare a lack of mutual assent (absent any facts that go beyond a simple declaration of no actual notice), when the common practice

of millions of American purchasers is that they voluntarily bind themselves to terms that favor the seller. The internet's miraculous reduction of transaction costs should not be disturbed so casually. *See generally* Ronald H. Coase, *The Problem of Social Cost*, 3 JOURNAL OF LAW & ECONOMICS 1, 15–28 (1960).

In sum, the Court concludes that Lens.com's hybrid-wrap agreement is enforceable. As a result, the Court will enforce the forum-selection clause against Plaintiff as to his common law claims for breach of contract (Count II) and unjust enrichment (Count III). The Court, however, declines to exercise its discretion to transfer Plaintiff's FDUPTA class claims to Nevada, as explained below.

### B. FDUPTA Class Claim (Count I).

By enacting the FDUPTA, the sovereign State of Florida has asserted its clear interest regarding unfair and deceptive business practices—regardless of contract. Plaintiff gives two main reasons why this Court should not transfer his FDUPTA class claims to Nevada. First and foremost, Plaintiff argues that the State of Florida has a strong interest in adjudicating the claims because tens of thousands of Florida consumers were allegedly charged illegal, undisclosed fees in excess of $5,000,000 over a four-year period. [ECF Nos. 1-1; 44]. Second, Plaintiff argues that the FDUPTA claims could disappear after transfer to Nevada in one of three ways: (1) the Nevada judge could require Plaintiff to recast the FDUPTA claims as claims brought under the analogous Nevada statute, which imposes a higher burden of proof and might be the death knell for the class; (2) the Nevada judge could grant Defendant's motion to dismiss the FDUPTA claims; or (3) the claims could be "swallowed up" in the pending nationwide class action filed in the District of Nevada, which was brought after this case was filed. *See Franks v. Lens.com, Inc.,* No. 2:24-cv-00724 (D. Nev.). [ECF No. 44 at 6–8].

Defendant argues that Nevada's higher evidentiary burden for deceptive trade claims is not enough to withstand transfer. Instead, Defendant says Plaintiff must show that "the purpose and

effectiveness of the FDUPTA would be seriously undermined if the claims" were litigated in Nevada. [ECF No. 45 at 2–3 (quoting and distinguishing *America Online, Inc. v. Pasieka,* 870 So.2d 170 (Fla. 2004))]. Because Plaintiff can pursue his class claims in Nevada—unlike the plaintiff in *America Online*—Defendant argues that Plaintiff cannot show harm to the FDUPTA. [*Id.*].

As for Plaintiff's argument that the Nevada court might dismiss Plaintiff's FDUPTA claims, Defendant represented at the October 25 hearing that scenario is unlikely because the Nevada judge presiding over the California case transferred there denied Defendant's motion to dismiss the California trade claims. But, of course, assignment of this case to that same judge is not guaranteed, and in any event the assignment of the case to a specific judge is not a factor this Court considers. What matters is whether proper application of Nevada law would seriously undermine the Florida FDUPTA claim.

After considering the law on this point, it is clear that the FDUPTA class claim should *not* be transferred. First and most fundamentally, the FDUPTA claim is an independent statutory claim completely severable, distinct, and independent of any claims arising from a contract. *See Management Computer Controls, Inc. v. Charles Perry Constr., Inc.,* 743 So.2d 627, 632 (Fla. 1st DCA 1999). So, notwithstanding the Court's ruling on the enforceability of the forum-selection clause (which is a determination made under contract law principles), Plaintiff's statutory tort claim need not, and the Florida legislature and Florida courts have declared should not, travel in lockstep with his contract or quasi-contract law claims.

Second and relatedly, the Court finds the State of Florida has a unique interest in adjudicating Plaintiff's FDUPTA class claim. The FDUTPA "seeks to prohibit unfair, deceptive and/or unconscionable practices which have transpired within the territorial boundaries of this state without limitation." *Millennium Comm. & Fulfillment, Inc. v. Office of the Attorney General,* 761 So.2d 1256, 1262 (Fla. 3d DCA 2000); *In re NationsRent Rental Fee Litig.,* No. 06-60924-CIV, 2009 WL 636188, at *4–5

(S.D. Fla. Feb. 24, 2009). Plaintiff's FDUPTA claims arise from Defendant's allegedly charging "Taxes & Fees" on products that the Florida legislature has deemed tax-exempt. Other state legislatures may have made different tax decisions. But in the Sunshine State, corrective contact lenses are exempt from sales tax as a matter of public policy declared by her elected representatives. Moreover, it is alleged that tens of thousands of Florida consumers have actually paid the illegal "Taxes and Fees" (to the tune of more than $5,000,000 over a four-year period no less). [ECF No. 1 ¶¶ 24, 29].

I have no doubt that a Nevada district judge assigned this case would be well qualified to apply Florida law. That is not the question. Rather, the question regarding transfer is whether Florida's sovereign interest would be "seriously undermined," by application of the law of the transferee state. The plain differences between Nevada and Florida procedural law in this context, as well as the clear concessions and proffers of counsel in this very case, demonstrate that Florida's sovereign interest in adjudicating this properly-pled FDUPTA claim should not be at risk of being undermined by transfer. At the October 25, 2024, hearing, the Court inquired into whether the FDUPTA claim would "actually go[] away" after the case is transferred to Nevada. Hearing Transcript (partial rough), p. 1, l. 5. In response, Defendant's counsel acknowledged that it had attempted to enforce the forum selection clause to strip out the unfair trade practices claim in the California case after it transferred to Nevada: "We said we didn't know if [the forum selection clause] was enforceable, but if it was valid and enforceable [as to the unfair trade claim], we'll try to enforce it, which we did[.]" *Id.*, p. 4 ll. 21–24. That poses enough of a risk to the sovereign interest of Florida such that the Court declines to transfer the FDUPTA claim.

Finally, transfer is discretionary under 28 U.S.C. § 1404(a) ("For the convenience of the parties and witnesses, in the interest of justice, a district court *may* transfer any civil action to any other district or division where it may have been brought[.]" (emphasis added)). Looking at the statutory factors that inform the exercise of this Court's discretion, none of them tips toward transfer of the FDUPTA

16

claim. In fact, they tip against transfer. The record reflects Plaintiff will face substantial hardship if forced to litigate in Nevada; whereas, Defendant, at bottom, argues that it would be inconvenienced to litigate here. However, Defendant admittedly raked in millions of dollars in taxes on tax-exempt products sold to thousands of Floridians. If those millions were made in violation of Florida law as alleged, the interest of justice is certainly not served by transferring the FDUPTA class claims to Nevada—where they could be extinguished entirely by operation of Nevada law even if there is sufficient evidence to prove them.

## IV.   CONCLUSION

In view of the foregoing, it is hereby **ORDERED AND ADJUDGED** as follows:

1. Defendants' Motion to Transfer [**ECF No. 17**] and Motion to Dismiss [**ECF No. 18**] are **DENIED IN PART** and **GRANTED IN PART**.

    a. The Court retains jurisdiction over Plaintiff's FDUPTA claims (Count I).

    b. Plaintiff's claims for breach of contract (Count II) and unjust enrichment (Count III) are **TRANSFERRED** to the District of Nevada pursuant to 28 U.S.C. § 1404(a).

2. Plaintiff's Motion to Strike [**ECF No. 46**] is **DENIED AS MOOT**.

3. Defendant must file an Answer to the FDUPTA claim, and the parties must file a Joint Scheduling Report for this case **no later than December 2, 2024.**

**DONE AND ORDERED** in the Southern District of Florida this 18th day of November, 2024.



DAVID S. LEIBOWITZ
UNITED STATES DISTRICT JUDGE

cc:  counsel of record